IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| ASHLEY WHITE, | ) |
| | ) |
|    Plaintiff | ) |
| | ) |
| v. | ) CASE NO. |
| | ) |
| CITY OF TALLADEGA, ALABAMA; | ) |
| DANIEL CHESSER; | ) |
| JASON BUSBY; and | ) |
| LARRY BARTON, | ) |
| | ) |
|    Defendants. | ) |

## COMPLAINT

Plaintiff complains of defendants, stating as follows:

### Jurisdiction and Venue

1. This action arises under the Fourth and Fourteenth Amendments to the United States Constitution, 42 U.S.C. § 1983. The Court has jurisdiction of this matter pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).

2. This judicial district is an appropriate venue under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the suit happened in this judicial district.

### Parties

3. Ashley White is of legal age, a U.S. citizen, and a resident of the State

of Alabama. She currently lives in Calhoun County, Alabama.

4. Defendant the City of Talladega, Alabama is a municipality organized and existing under the laws of the state of Alabama.

5. Defendant Daniel Chesser was employed by the City of Talladega as a police officer at all times relevant to the allegations in this complaint and is a resident and citizen of the State of Alabama. He is sued in his individual capacity.

6. Defendant Jason Busby was employed by the City of Talladega as the police chief at all times relevant to the allegations in this complaint and is a resident and citizen of the State of Alabama. He is sued in his individual capacity.

7. Defendant Larry Barton was employed by the City of Talladega as its mayor at all times relevant to the allegations in this complaint and is a resident and citizen of the State of Alabama. He is sued in his individual capacity.

## Facts

8. The Talladega Police Department has a canine unit program.

9. Defendant Chesser worked as an officer in the program.

10. Defendant Chesser's assigned dog was Andor.

11. On or about June 12, 2015, Chesser stopped a vehicle in which plaintiff was a passenger.

12. Though plaintiff was not guilty of any crime, out of fear she ran.

13. After initially refusing to stop in response to Chesser's command, plaintiff tripped and fell to the ground.

14. Plaintiff then yelled that she was female and that she surrendered.

15. Chesser saw and heard plaintiff's surrender.

16. Nevertheless, Chesser released Andor and commanded him to "get that son of a bitch."

17. Andor attacked plaintiff in the area of her buttocks, biting her and shaking his head.

18. Eventually, Chesser commanded Andor to stop.

19. Andor did not immediately stop attacking plaintiff in response to Chesser's command and continued biting plaintiff while shaking his head.

20. At the time Chesser released Andor he knew not only that plaintiff had surrendered but also that he could not control Andor.

21. Eventually, the dog released plaintiff.

22. Plaintiff was treated by paramedics on the scene and taken to the hospital.

23. As a result of Andor's attack, plaintiff suffered severe injuries and required reconstructive surgery and hospitalization.

24. The Talladega Police Department has in place written policies and procedures establishing, among other things, canine unit training and monitoring

standards for all canine unit officers and dogs; the limited circumstances in which canine units are allowed to be deployed in apprehending suspects; and the frequency of evaluation, monitoring, training, and re-training of canine unit officers and dogs necessary to operate the canine unit within constitutional parameters, etc.

25. The Talladega Police Department's written policies and procedures required that canines only be deployed in those circumstances in which there was a felony suspect who represented a high risk of injury to the public, officers, or others.

26. The Talladega Police Department's written policies and procedures required that canines only be deployed to apprehend fleeing felony suspects, hiding felony suspects, or concealed felony suspects.

27. Nevertheless, an informal policy and custom developed that canine units could be deployed with few limits on the canine officer's discretion.

28. Defendants Busby and Barton were final policymakers for law enforcement policies, practices, and customs for the City.

29. Defendants Busby and Barton had final decision-making authority over the manner in which Talladega canine units were trained and supervised and for the unit's practices in the apprehension of suspects.

30. Defendants Busby and Barton created and/or approved a policy or custom that canines could be deployed to apprehend misdemeanor suspects.

31. Defendants Busby and Barton created and/or approved a policy or

custom that canines could be deployed when subjects were not fleeing or resisting.

32. Defendants Busby and Barton approved, created, and/or ratified policies or customs that amounted to a failure to train and supervise the constitutional use of canine force used by members of the Talladega Police Department.

33. Defendants Busby and Barton had specific knowledge that Chesser and his canine were acting outside of policy and applicable law regarding search and seizure and use of force. Despite this knowledge, Busby and Barton failed to train and supervise Chesser regarding his frequently reported unconstitutional use of canine force, violations of the City's's written policies and procedures regarding canine deployment on suspects, and violations of established search and seizure law.

34. Prior to the assault on plaintiff, City policy and applicable police standards required that any canine unit (such as Chesser and Andor) was required to complete an extensive training course relating to obedience and police work.

35. Prior to the assault on plaintiff, the standard for police canine units was to train the dogs to "bite and hold" if commanded to do so by its handler and to continue to bite and hold until countermanded by the handler.

36. Injury to a suspect is inevitable when a canine employs the bite and hold function.

37. A canine unit dog is trained to maintain the bite and hold until countermanded by the handler.

38. Prior to the assault on plaintiff, police canine unit training standards required that the handler have complete control over the dog in order to avoid situations in which a dog may bite a suspect unnecessarily and to avoid situations in which a police dog refuses to let go of its bite when commanded to do so. The purpose of both of these training standards is to minimize incidents in which a police dog bites a suspect and to minimize injuries caused by dog bites.

39. Prior to the assault on plaintiff, police canine unit standards adhered to the principle that the responsiveness of well-trained canine unit dogs will erode over time and that continual evaluation, monitoring, and training of police dogs was necessary to ensure that they will perform responsibly.

40. Prior to the assault on plaintiff, police canine unit standards required that strict performance monitoring be conducted on canine units to ensure that dogs responded to commands and that handlers acted appropriately in controlling their dogs in the field.

41. Prior to the assault on plaintiff, the Talladega Police Department did not have in place appropriate procedures to monitor the performance of its canine units.

42. Prior to the assault on plaintiff, Chesser and Andor were the subject of numerous incidents in which Chesser unnecessarily deployed Andor or failed to call Andor off in a timely manner, in violation of City policies and clearly established constitutional principles under the Fourth Amendment to the United States

Constitution.

43. Prior to the assault on plaintiff, from numerous citizen and police officer complaints and other sources, City policymakers, including Barton and Busby, were made aware that Chesser and Andor were acting outside of policy and constitutional standards and were, at a minimum, in need of re-training and supervision.

44. For example, on August 5, 2014, another City police officer and former canine unit officer, Sgt. Marco Williams, notified his superior officers, Captains Leon Thomas and John McCoy, that due to inappropriate deployment of Andor in recent misdemeanor calls, Chesser required remedial training on the canine unit policy.

45. Sgt. Williams specifically recommended to Captain King that Chesser be suspended from any further canine apprehension deployments until he could demonstrate under similar conditions that he and his dog could reliably act within the appropriate standards for canine unit training.

46. Sgt. Williams specifically recommended to Captain King that Chesser be suspended from any further canine apprehension deployments until he could demonstrate that he understood the Talladega Police Department rules and regulations concerning use of force and concerning deployment of canines, as well as and the relevant case law of search and seizure.

47. Sgt. Williams specifically reported to Captain King that during Williams' investigation into prior incidents involving Chesser's deployment of Andor against

misdemeanant suspects, he discovered that Chesser hid from his superiors at the Talladega Police Department those problem areas with his canine unit, which included his dog's lack of responsiveness to Chesser's commands.

48. Sgt. Williams also reported that Chesser failed to document Andor's aggressive behavior in his use of force reports and that Chesser omitted facts concerning Andor's aggressive behavior when asked during post-incident investigations.

49. Sgt. Williams reported that during his questioning of Chesser about a prior incident in which Chesser deployed Andor during a misdemeanor call in violation of the written rules and regulations at the Talladega Police Department, that Chesser gave "incorrect and vague reports" and stated that Busby had cleared Chesser to use the canine Andor for apprehension of misdemeanor violators.

50. Sgt. Williams' concerns about Chesser and Andor were communicated to Busby and Barton shortly after August 5, 2014.

51. Busby and Barton were specifically made aware of the concerns expressed by Sgt. Williams relating to Chesser and his canine unit dog and their need for closer supervision, re-training, and disciplinary action.

52. Prior to the assault on plaintiff, Busby and/or Barton were specifically aware that Chesser and Andor frequently used excessive force.

53. The incidents of which City policymakers were aware included not only

the incidents documented in the Williams report but also other assaults, including a November 14, 2014, assault on Crystal Houston.

54. Busby and Barton also were aware that Andor was not responding to Chesser's commands when deployed and that Chesser was exercising bad (unconstitutional) judgment in the use of canine force.

55. Busby and Barton were aware that unless Chesser and Andor, at a minimum, received additional training in the constitutional use of canine force as recommended by Sgt. Williams, that ordinary citizens like plaintiff would likely suffer violations of their constitutional rights due to unnecessary use of canine force.

56. Busby and Barton ignored Sgt. Williams' recommendations that Chesser be re-trained and also ignored Sgt. Williams' recommendation that Chesser be disciplined.

57. Busby and Barton failed to take any action whatsoever.

58. Busby and Barton's failure and inaction to train, supervise, and discipline Chesser for routinely deploying his canine in an unconstitutional manner constituted a policy or custom of failure to train canine unit officers at the Talladega Police Department.

59. Busby and Barton's failure to train, supervise and discipline Chesser for the deployment his canine in violation of known police canine force standards and City rules and regulations constituted a policy or custom of failure to train canine unit

officers at Talladega Police Department.

60. Busby and Barton's failure to require re-training for Andor when they knew that Andor was not responsive to Chesser's commands constituted a policy or custom of failure to train canine unit animals at Talladega Police Department.

61. The policies or customs regarding the failure to train, supervise, and discipline Chesser described above constituted deliberate indifference to citizens' rights.

62. The policies or customs of failure to train Chesser as described above constituted deliberate indifference because they created a substantially higher likelihood that misdemeanor suspects like plaintiff would suffer constitutional deprivations and physical injuries due to unnecessary canine force.

63. The policies or customs of failure to require re-training for Andor as stated above constituted deliberate indifference because they placed misdemeanor suspects like plaintiff at risk of known and expected injuries than would otherwise not occur during normal citations and arrests.

64. These deliberately-indifferent customs and policies of failure to train were known to Chesser and were authorized and implemented by Busby, Barton, and their subordinates.

65. Defendant Chesser's unconstitutional use of force toward plaintiff was motivated by malice and/or involved a reckless and callous indifference to plaintiff's

constitutional right to be free from the unreasonable use of force.

66. The force used by defendant Chesser was objectively unreasonable and unnecessary for defendant Chesser to defend either himself or any other person from bodily harm during the arrest of plaintiff.

67. The force used by defendant Chesser was objectively unreasonable and constituted the excessive use of force, in violation of plaintiff's clearly established constitutional rights under the Fourth and Fourteenth Amendments and 42 U.S.C. § 1983.

68. As a direct and proximate result of the conduct of defendant Chesser, plaintiff suffered bodily injury, pain and suffering, disability, disfigurement, mental anguish, and the expense of medical care and treatment. The losses are either permanent or continuing, and plaintiff will suffer the losses in the future.

69. At the time that Chesser and his canine were deployed and caused injury to plaintiff, there was a history of widespread abuse that was obvious, flagrant, rampant, and of continued duration involving the deployment of canines.

70. Defendants Busby and Barton were on notice of this widespread abuse and of the need to take corrective action and failed to do so.

71. The City, through its final policymakers, including defendants Busby and Barton, implemented an official policy or custom to allow the use of canines to apprehend misdemeanor suspects even when those suspects were following orders,

not resisting, and were not threatening harm to any officer or any other person. This policy or custom resulted in Chesser violating plaintiff's Fourth Amendment Right to be free from the unreasonable use of force.

72. The City, through its final policymakers, including defendants Busby and Barton, implemented an official policy or custom to allow the use of canines to apprehend non-dangerous misdemeanor suspects. This policy or custom resulted in Chesser violating plaintiff's Fourth Amendment Right to be free from the unreasonable use of force.

73. Defendants Busby and Barton implemented an official or unofficial policy or custom for the failure to train and/or supervise Chesser and Andor as described herein.

74. As a result of the City's implementation and/or ratification of official and unofficial policies and customs described herein, Chesser violated plaintiff's Fourth Amendment Right to be free from the unreasonable use of force.

75. More generally, City policymakers, including Busby and Barton, were aware of numerous incidents in which citizens were subjected to unconstitutional actions by City officers, including stops, searches, arrests, and uses of force but took no action to investigate and discipline officers.

76. Prior to the incident involving plaintiff, the City permitted, encouraged, and ratified a pattern and practice of misconduct in that the City:

      a.    failed to discipline or prosecute or in any manner deal with known incidents of misconduct; and

      b.    refused to investigate complaints of misconduct, and, instead, officially claimed such incidents were justified and proper.

77. Thus, few, if any, officers received informal criticism, let alone formal discipline and certainly were not terminated, for violating a citizen's constitutional rights.

78. Chesser is a prime example. Despite knowledge of his abuse of citzens using Andor, City policymakers, including Busby and Barton, failed and refused to discipline him.

79. City policymakers were aware of prior incidents through use of force reports (which are approved through the chain of command), complaints from citizens, reports from other officers (like Sgt. Williams), and through other sources.

80. Through long-established practice, the City's policymakers, including Busby and Barton, established a custom or policy that incidents of possible, likely, or known misconduct are not investigated or are investigated only with an eye toward protecting the City from civil liability, with the foreseeable result that officers believe they can get away with violating citizens' rights.

81. In furtherance of this custom or policy, the City has set up a system that discourages citizen complaints. In fact, instead of reviewing incidents of possible, likely, or known misconduct, such incidents are routinely approved through the chain

of command.

82. Because use of force reports and internal investigations are not a matter of public record, the number of excessive force and other incidents sanctioned by the City is not known.

83. The foregoing acts, omissions, and systemic failures and deficiencies are policies and customs of the City and caused officers to believe that constitutional violations would be tolerated and that complaints would not be honestly or properly investigated, with the foreseeable result that officers would violate the constitutional rights of plaintiff and other similarly-situated citizens.

### Count I - 42 U.S.C. § 1983 - Excessive Force

84. As explained above, on or about July 3, 2015, defendant Chesser, acting under color of law within the meaning of 42 U.S.C. § 1983, assaulted and battered plaintiff, thereby depriving plaintiff of plaintiff's rights under the Fourth and Fourteenth Amendments to the Constitution of the United States in violation of 42 U.S.C. § 1983. Specifically, he violated plaintiff's right to be free from excessive force.

85. Chesser acted with malice or reckless indifference to plaintiff's constitutional rights.

86. The City's policies and customs described above, established by

defendants Busby and Barton, were the moving force behind Chesser's violation of plaintiff's Fourth Amendment rights.

87. As a result of the conduct of defendants, plaintiff has been caused to suffer physical and emotional injuries and damages and has been caused to incur medical bills and other expenses.

**Count II - State Law - Assault and Battery/Excessive Force (Chesser Only)**

88. On or about February 6, 2015, Chesser assaulted and battered and used excessive force on plaintiff.

89. The conduct of Chesser was either negligent, wanton, malicious, willful, or in bad faith.

90. As a result of the conduct of defendant, plaintiff has been caused to suffer physical and emotional injuries and damages and has been caused to incur medical bills and other expenses.

**Other Matters**

91. All conditions precedent to the bringing of this suit have occurred.

**Relief Sought**

92. As relief, plaintiff seeks the following:

    a. That plaintiff be awarded such compensatory damages as a jury shall determine from the evidence plaintiff is entitled to recover;

    b. That plaintiff be awarded against the individual defendants only

        such punitive damages as a jury shall determine from the evidence plaintiff is entitled to recover;

    c.     That plaintiff be awarded prejudgment and postjudgment interest at the highest rates allowed by law;

    d.     That plaintiff be awarded the costs of this action, plaintiff's reasonable attorney's fees, and plaintiff's reasonable expert witness fees;

    e.     That plaintiff be awarded such other and further relief to which plaintiff is justly entitled.

**Dated: March 7, 2017.**

        Respectfully submitted,

        /s Henry F. (Hank) Sherrod III
        Henry F. (Hank) Sherrod III
        No. ASB-1200-D63H
        HENRY F. SHERROD III, P.C.
        119 South Court Street
        Florence, Alabama 35630
        Phone: 256-764-4141
        Fax: 877-684-0802
        Email: hank@alcivilrights.com

        Attorney for Plaintiff

**Jury Demand**

Plaintiff requests a trial by jury.

        s/ Henry F. (Hank) Sherrod III
        Henry F. (Hank) Sherrod III